FILED

2012 Feb-15  AM 11:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **CHARITY MATHIS,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **v.** | ) | Civil Action Number |
| | ) | **4:10-cv-01384-JEO** |
| **CITY OF GADSDEN,** | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

Charity Mathis ("plaintiff") sued her former employer, the City of Gadsden ("the City"), alleging that she was subjected to a hostile work environment based on her sex and that the City retaliated against her for reporting the harassment.  (Doc. 1)  She alleges both claims as violations of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e *et seq*. ("Title VII").  (*Id*.)  The City moves for summary judgment on both claims (doc. 12), and, for the reasons set forth below, the motion is due to be granted in part and denied in part.

## I.   FACTS AND PROCEDURAL BACKGROUND[1]

### A.   Plaintiff's Employment History

Plaintiff worked as a part-time employee in the Public Works Department of the City of Gadsden from October 2006 to February 2007, and then as a full-time employee from February 2007, until her resignation in February 2010.  (Doc. 14-1, Plaintiff Dep., at 49:19-20; 50:7-9;

---

[1]The facts are presented in the light most favorable to the plaintiff.

52:11-17).[2]  Within the Public Works Department, she worked for various subdepartments and, in 2009, she began working with the Street Maintenance Department.  (Doc. 14-1, Plaintiff Dep., at 53-57).  At all relevant times, Mike Hilton served as the Street Maintenance Superintendent, and David Cooper served as the Street Maintenance Supervisor.  (Doc. 14-1, Plaintiff Dep., at 55:17-19; Doc. 21-1, Hilton Dep., at 4:19-21, 5:14).  Cooper and/or Hilton assigned the workers to a particular crew, such as asphalt, concrete, or ditching, at 7:00 a.m. each morning.  (Doc. 14-1, Plaintiff Dep., at 75:10-19; 76:12-15; 105:1-7).  The crews then left immediately for their work sites and returned to Public Works at 3:00 p.m. each afternoon.  (Doc. 14-1, Plaintiff Dep., at 97:16).

The present action arises from plaintiff's general interaction with her co-workers in the Street Maintenance Department and her specific assignments with the asphalt and concrete crews.  When plaintiff began working in the Street Maintenance Department, Cooper and/or Hilton assigned her to drive a dump truck for the ditching crew "99 percent of the time."  (Doc. 14-1, Plaintiff Dep., at 77:15-17; 78:12-17; 133:19-22).  However, plaintiff claims that after she began complaining of sexual harassment by her co-workers, Cooper and/or Hilton disciplined her by assigning her to the concrete and asphalt crews, which she characterizes as more labor intensive.  (Doc. 1 at 5 ¶¶ 22-23; Doc. 14-1, Plaintiff Dep., at 69:12-18; 88:9-13; 255:2-6).  She further claims that the City suspended her without pay in response to her complaints of sexual harassment and that the harassment and suspension precipitated a constructive discharge.  (Doc. 1 at 5 ¶ 24).

---

[2]References herein to "Doc. __" are to the electronic numbers assigned by the Clerk of the Court.  References to page numbers are also to the electronic page numbers found at the top of the document.  References to the depositions are to the page numbers and lines on the original document, not the electronic numbers.

**B.**      **Day Room at the Public Works Department**

Workers in the Street Maintenance Department typically gathered in an area known as the "day room" before and after their shifts.  (Doc. 14-1, Plaintiff Dep., at 109:17-20; 209:20-210:1-8).  According to plaintiff, co-workers Billy Bassanatt, Chris Horton, and Wayne Lewis "ruled the roost" and regularly whistled at "the office girls" and made comments such as "[l]ook at the ass on that girl," "you can almost see her crotch," "you can see her underwear," "give me a piece of that ass," and "[l]ook at them big ol' titties."  (Doc. 14-1, Plaintiff Dep., at 205:21-206:3; 215:19-22).  In addition, Bassanatt and Horton regularly talked about "getting blow jobs while they were at work from prostitutes on East Broad Street," and "getting their dicks whacked off while they were getting a ... massage." (Doc. 14-1, Plaintiff Dep., at 208:1-6; 209:13-14; 215:5-6).  Accordingly to plaintiff, the sexually-charged comments from Bassanatt and Horton were "all the time....  If they were anywhere around, that's why they were doing.  They talked about stuff like that in the day room in the afternoon, they talked about it in the mornings."  (Doc. 14-1, Plaintiff Dep., at 209:6-12).  Additionally, plaintiff testified that everyone in the day room would talk about "how big [a co-worker's] dick was."  (Doc. 14-1, Plaintiff Dep., at 109:7-8).

Plaintiff testified that she complained about the behavior and comments to Cooper, Hilton, and Brian Stovall, the director of the Public Works Department.  (Doc. 14-1, Plaintiff Dep., at 110:7-10; 111:20-23; 202:1213; 207:7-11; 212:9-22).  She testified that Stovall said "[n]othing really" in response and that "nothing was ever done about it."  (Doc. 14-1, Plaintiff Dep., at 113:12-23; 115:6-7; 214:16-20).

In addition, at an unspecified time, plaintiff found a "porno book" and dildo in the truck she regularly drove as well as a "dick carved into the ox on the bed of the truck that [she] drove."

(Doc. 14-1, Plaintiff Dep., at 216:3-6).  Plaintiff complained of these items to Stovall.  (Doc. 14-1, Plaintiff Dep., at 216:20-217:1).  Shortly after she complained, the items were removed from the truck.  (Doc. 14-1, Plaintiff Dep., at 218:12-15).

## C.    First Incident with Fred Winston on the Concrete Crew

In early April 2009, apparently after plaintiff complained to Cooper, Hilton, and Stovall about the behavior of her co-workers, Cooper and/or Hilton assigned plaintiff to work on a concrete crew led by Don Chandler.[3]  (Doc. 14-1, Plaintiff Dep., at 72:14-16; 203:6-9).  Plaintiff had previously worked with the concrete crew for only an hour or two, and, on the first morning of the new assignment, co-worker Fred Winston told plaintiff that "[she] needed to get out of the truck and go to work, just because [she] had titties and [she] was a girl didn't mean that [she] was going to get any kind of special treatment."  (Doc. 14-1, Plaintiff Dep., at 83:23-84:4; 87:17-22).  Winston also told plaintiff that she "wasn't Chandler's pet, just because he liked [her] like that didn't mean [Winston] did."  (Doc. 14-1, Plaintiff Dep., at 84:4-6).  Chandler told Winston to leave plaintiff alone and "to keep his mouth shut," but Winston continued the comments. (Doc. 14-1, Plaintiff Dep., at 86:2-3).  Plaintiff began to cry and called Cooper, the Street Maintenance Supervisor, to report Winston's comments.  (Doc. 14-1, Plaintiff Dep., at 84:7-11). Cooper came to the work site and told everyone to get along.  (Doc. 14-1, Plaintiff Dep., at 84:12-14).

After Cooper left, Winston continued to tell plaintiff:  "[Y]ou are going to work if you are out here with us.  It don't matter if you are female."  (Doc. 14-1, Plaintiff Dep., at 90:22-91:2).

---

[3]Plaintiff's testimony is often quite unclear and conflicting as to dates on which harassment occurred and when she complained.  Viewing the evidence in the light most favorable to her, the court finds that Cooper and/or Hilton assigned her to the concrete crew after she repeatedly complained about the conduct in the day room.

Winston also told plaintiff that "just because you got a pussy don't mean you're any different that I am.  You wanted this job.  You signed on a job to come out here, so you are going to do just as much as I do."  (Doc. 14-1, Plaintiff Dep., at 92:4-8).  Chandler heard the comments and continued to tell Winston to "shut up."  (Doc. 14-1, Plaintiff Dep., at 91:6-8).

That day plaintiff also called Jerry Gladden, the Personnel Director for the City, to complain about Winston's comments.  (Doc. 14-1, Plaintiff Dep., at 178:9-179:3).  Gladden told plaintiff that "if [she] had any other problems to leave and come to his office [at City Hall], that they weren't going to tolerate it."  (Doc. 14-1, Plaintiff Dep., at 95:4-8).  The record is unclear, but it appears that plaintiff continued to work on the concrete crew that day.

## D.    Second Incident with Fred Winston on the Concrete Crew

The next day, Cooper and/or Hilton again assigned plaintiff to work on the concrete crew with Winston.  (Doc. 14-1, Plaintiff Dep., at 93:5-8).  Winston continued making harassing comments to plaintiff such as "just because [she] got a pussy [she's] not any different than him." (Doc. 14-1, Plaintiff Dep., at 94:14-16).  In response, plaintiff again relayed Winston's comments to Cooper.  (Doc. 14-1, Plaintiff Dep., at 93:5-6; 94:1-9; 176:2-11).  Cooper came to the work site and spoke with Chandler and plaintiff, but did not get out of his truck.  (Doc. 14-1, Plaintiff Dep., at 93:5-8; 19-21).  Plaintiff also called Gladden to again complain of Winston's comments. (Doc. 14-1, Plaintiff Dep., at 178:21-179:3).  According to plaintiff, Gladden told her that he would look into the situation.  (Doc. 14-1, Plaintiff Dep., at 179:4-7).  Additionally, at an unspecified date, possibly after the second incident, plaintiff complained to Hilton, the Street Maintenance Superintendent, about Winston, and, according to plaintiff, Hilton told her that "[h]e would take care of it."  (Doc. 14-1, Plaintiff Dep., at 116:18).  Plaintiff believes that she

was assigned to the asphalt crew the following day.  (Doc. 14-1, Plaintiff Dep., at 116:22-23).

**E.      Third Incident with Fred Winston on the Concrete Crew**

One or two days after plaintiff's initial two incidents on the concrete crew, Cooper and/or

Hilton reassigned plaintiff to the concrete crew with Winston.  (Doc. 14-1, Plaintiff Dep., at

173:9-17).  He continued to make harassing statements, but plaintiff did not view the comments

as sufficient to complain "because they wasn't [sic] going to do anything about it."  (Doc. 14-1,

Plaintiff Dep, at 174:9-12).  However, plaintiff thought "that's enough," when Winston began

"talking about pussy and dick, and ... why women wear tongue rings where they can lick each

other's clits and pussies."  (Doc. 14-1, Plaintiff Dep., at 174:12-16; 175:9-10).  Plaintiff called

Cooper and relayed Winston's comments.  (Doc. 14-1, Plaintiff Dep., at 175:20-21).  According

to plaintiff, Cooper told her "more or less [to] overlook it" and did not come to the work site.

(Doc. 14-1, Plaintiff Dep., at 176:18-20; 177:7-9).  She felt "that's enough.  I'm leaving."  (Doc.

14-1, Plaintiff Dep., at 174:15-16).

After unsuccessfully trying to telephone the mayor's office to complain about Winston's

conduct, plaintiff again called Gladden, the City's Personnel Director.  (Doc. 14-1, Plaintiff Dep.,

at 99:12-14; 100:11-15; 177:19-21).  According to plaintiff, Gladden told plaintiff that if she had

any more problems with Winston she should leave the work site and come to City Hall.  (Doc.

14-1, Plaintiff Dep., at 100:16-17).  During the lunch break, plaintiff went to City Hall and spoke

with Gladden.  (Doc. 14-1, Plaintiff Dep., at 101:15-19; 180:5-13).  While plaintiff was speaking

with Gladden, the mayor's secretary telephoned plaintiff and told her that she had an

appointment with the mayor the next day at 1:00 p.m.  (Doc. 14-1, Plaintiff Dep., at 102:1-4;

180:5-13).  The record is unclear as to whether plaintiff returned to her crew or went home, but

the court presumes plaintiff returned to the concrete crew.

**F.      Plaintiff's Suspension**

The next day, Friday, April 17, 2009, Cooper and/or Hilton again assigned plaintiff to the concrete crew with Winston while another worker was assigned to the truck plaintiff had often driven.  (Doc. 14-1, Plaintiff Dep., at 129:3-18; 236:20-237:21; 238:14-15).  Plaintiff was upset that "[t]hey was [sic] putting me back in the situation with the sexual harassment again."  (Doc. 14-1, Plaintiff Dep., at 129:14-16).  Before she left with the concrete crew, she asked Cooper if she could leave at 8:00 a.m. to go to City Hall.  (Doc. 14-1, Plaintiff Dep., at 237:23-238:2). Cooper authorized the leave, and plaintiff then went to Hilton to ask him why he had assigned another worker to the truck she liked to drive.  (Doc. 14-1, Plaintiff Dep., at 238:14-15). According to plaintiff, Hilton replied that she was a low-level worker and that he could put her wherever he wanted.  (Doc. 14-1, Plaintiff Dep., at 238:15-17).  Plaintiff believed that "because [she] was complaining about the sexual harassment and they wasn't [sic] doing anything about it, so they wanted to take me and discipline me by doing that."  (Doc. 14-1, Plaintiff Dep., at 160:4-8).

Shortly after plaintiff spoke with Hilton, Cooper telephoned plaintiff and told her that Hilton would not authorize her to go to City Hall and that she would have to go after work because she did not have sufficient personal leave.  (Doc. 14-1, Plaintiff Dep., at 120:7-12; 238:18-23).  Plaintiff then went to see Hilton and asked why he would not authorize her leave. (Doc. 14-1, Plaintiff Dep., at 239:18-22).  According to plaintiff, Hilton responded "because I know what you're going to do at city hall and I'm not going to let that bullshit happen, I'm going to stop it right here."  (Doc. 14-1, Plaintiff Dep., at 240:1-4).  Plaintiff responded "well, I guess

I'm leaving" to which Hilton responded "just take a week."  (Doc. 14-1, Plaintiff Dep., at 240:10-11).

Plaintiff then went to City Hall to speak with Gladden because he had told her if she felt like she was being harassed, "to leave the job regardless of what anybody said and come up [to City Hall] and talk to him."  (Doc. 14-1, Plaintiff Dep., at 120:10-12; 137:1-2; 242:2-8).  At some point that morning, the mayor's assistant called plaintiff and told her that the mayor canceled the meeting scheduled for that day because "he didn't feel that it was important enough at the moment."  (Doc. 14-1, Plaintiff Dep., at 103:5-7; 181:5-9).  According to plaintiff, Gladden told her that he would speak with the mayor and call her later.  (Doc. 14-1, Plaintiff Dep., at 126:22-23).  After speaking with Gladden, plaintiff went home.  (Doc. 14-1, Plaintiff Dep., at 126:7-8; 130:4).

The next Monday, April 20, 2012, plaintiff arrived at work and was "talked to like a piece of shit," and informed that she was suspended for five days without pay, to include the previous Friday, for leaving the work site without authorization.  (Doc. 14-1, Plaintiff Dep., at 181:23-182:2; 255:10-13).  Plaintiff returned to work on Friday, April 24, 2009.  (Doc. 14-1, Plaintiff Dep., at 258:1-3).

**G.      Incident with Charles Gardner on the Asphalt Crew**

After plaintiff returned from her suspension, Cooper and/or Hilton assigned plaintiff to the asphalt crew along with Charles Gardner, among others.[4]  (Doc. 14-1, Plaintiff Dep., at 104:6-14; 106:16-17; 117: 14-19; 182:9-12).  Plaintiff had worked previously with Gardner in

---

[4]Notably, plaintiff offers conflicting testimony as to when the incidents with Gardner occurred.  (Doc. 14-1, Plaintiff Dep., at 114:19-21; 117:18-19; 118:16-17; 182:9-12).

2006, when she worked part-time on a leaf crew.  At various times throughout 2006 she

complained to the leader of that crew, Cooper, Hilton, and Stovall "about the way [Gardner]

acted, the staring and the certain things that he said and talked about other women and things like

that."  (Doc. 14-1, Plaintiff Dep., at 183:17-22; 186:21; 187:5-16).  When Cooper and/or Hilton

again assigned plaintiff to work with Gardner on the asphalt crew, Gardner would stare at

plaintiff and then "roll[] his eyes in the back of his head like he's getting off."  (Doc. 14-1,

Plaintiff Dep., at 108:3-5).  Gardner would also stare at plaintiff and "talk about how big his dick

is."  (Doc. 14-1, Plaintiff Dep., at 109:2-6).  Plaintiff told Gardner to stop staring at her and

complained about Gardner to Cooper, Hilton, and Stovall.  (Doc. 14-1, Plaintiff Dep., at 108:8-

10; 109:21-23; 110:4-10; 118:5-11, 21-22).  According to plaintiff, Cooper, Hilton, and Stovall

told her that "they would take care of it."  (Doc. 14-1, Plaintiff Dep., at 119:5).

## H.    Meeting After Suspension

The week following her suspension, plaintiff met with the mayor, the mayor's assistant,

Gladden, Stovall, and Hilton.  (Doc. 14-1, Plaintiff Dep., at 194:7-22).  Plaintiff testified that she

told the group that at least five individuals had harassed her, including Horton, Bassanatt, Lewis,

Winston, and Gardner.  (Doc. 14-1, Plaintiff Dep., at 199:7-22; 200:23-201:2).  Following the

meeting, Gladden wrote a letter dated May 1, 2009, to plaintiff stating:

> The Mayor wanted to address the two issues you brought to him in the meeting in
> his office on April 29.
>
> The first issue was harassment in the workplace....
>
> The City's harassment policy has been explained to the two individuals you
> mentioned and they have been warned.  The City will not tolerate harassment in
> the workplace and if you have any problems in the future you are to report it to
> Mike Hilton, Brian Stovall, or myself immediately....

> The second issue was the five day suspension.  Having reviewed your personnel file there was a written warning dated May 29, 2008, which is counted for one year against your record.  A second violation within that time period goes to the next step, which is suspension.  The Mayor believes you were given a reasonable order to go to work.  When given a reasonable order, the City cannot have an employee walking off the job if they don't like the work assignment.  The last incident with an employee walking off the job resulted in an 11 day suspension.  In light of that, your 5 day suspension seems reasonable.

(Doc. 14-2, Gladden Letter, at 1).  The record evidence indicates that plaintiff previously received a May 29, 2008, warning for tardiness.  (Doc. 14-11, Employee Disciplinary Report, at 1).  Pursuant to the City's Handbook for Public Works employees, written warnings are counted against an employee's record for one year and, after receiving a written warning, an employee may be suspended up to 10 working days for violating the rule that "[e]very employee scheduled to be at work shall be at work unless on approved leave or absence or with a justified reason approved b[y] the department director."  (Doc. 14-1, Public Works Handbook, at 8-9).

Gladden also wrote a memorandum dated April 29, 2009, stating that he, Stovall, and Hilton met with Winston on April 29, 2009, to inform him that plaintiff reported that he made inappropriate comments in her presence and that these comments made her uncomfortable.  (Doc. 14-9, Gladden Memo, at 1).  The memorandum states that Winston was told that the City would not tolerate harassment in the workplace.  (*Id*.)  The memorandum also notes:  "Hilton reassigned [plaintiff] so she would not be working in Mr. Winston's crew.  She was reassigned to drive a truck, which is what she wanted."  (*Id*.)  Notably, the memorandum is dated April 29, 2009, but it references the May 1, 2009, letter to plaintiff.  (*Id*.)

Plaintiff testified that she believed that the two individuals referenced in the May 1, 2009, letter as receiving warnings refers only to warning Horton and Bassanatt, and not Winston and Gardner, because thereafter when she arrived in the day room Bassanatt would "stand up and say,

10

shush, everybody be quiet, she is here, don't say nothing you don't want nobody to know, don't

get in trouble, keep your mouth shut."  (Doc. 14-1, Plaintiff Dep., at 269:13-17).  Plaintiff also

testified that she saw Bassanatt and Horton once walk out of the day room holding written

warnings and that she believed the warnings were related to her complaints. (Doc. 14-1, Plaintiff

Dep., at 269:20-270:4).

However, plaintiff also testified that Winston stated that City officials told him to leave

her alone.  (Doc. 14-1, Plaintiff Dep., at 282:3-9).  Consistent with this assertion, plaintiff

testified that after her April 29, 2009, meeting with the mayor, Winston then stopped making

sexually derogatory comments to her, but continued to make comments toward other females.

(Doc. 14-1, Plaintiff Dep., at 282:11-13; 291:17-21).  Additionally, after her meeting with the

mayor, plaintiff testified that she no longer worked with Gardner and could not recollect any

further problems with him.  (Doc. 14-1, Plaintiff Dep., at 284, 11-17).  Plaintiff complained

further about Winston to Stovall, who told plaintiff that "[h]e would see what was going on."

(Doc. 14-1, Plaintiff Dep., at 294:5-10).  Plaintiff testified that she knew of no corrective action

taken by Stovall.  (Doc. 14-1, Plaintiff Dep., at 294:18-20).

## I.      EEOC Charge

Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC")

on May 4, 2009, alleging sex discrimination and retaliation by the City.  (Doc. 18-1, EEOC

Charge, at 68).  Plaintiff resigned in February 2010, because she "got tired of the harassment."

(Doc. 14-1, Plaintiff Dep., at 295:4).  On June 2, 2010, she commenced this action.

## II.   SUMMARY JUDGMENT STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam ) (citation to former rule omitted); FED. R. CIV. P.56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[5]   The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [-now dispute-] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322–24.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997)

---

[5]Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions."  Fed. R. Civ. P. 56 Advisory Committee Notes.  Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word-genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination." *Id.*  "'Shall' is also restored to express the direction to grant summary judgment." *Id.*  Thus, although Rule 56 underwent stylistic changes, its substance remains the same and, therefore, all cases citing the prior versions of the rule remain equally applicable to the current rule.

(quoting *Anderson*, 477 U.S. at 259).  However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *Anderson*, 477 U.S. at 249; *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden" so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988) (quoting *Anderson*, 477 U.S. at 254).  Nevertheless, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.  *Anderson*, 477 U.S. at 255.  The nonmovant need not be given the benefit of every inference but only of every reasonable inference.  *Brown v. Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).  "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment."  *Allen*, 121 F. 3d at 643.

## IV.   ANALYSIS

Title VII of the Civil Rights Act prohibits employers from discriminating in the workplace on the basis of an individual's "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e *et seq*.  Title VII also prohibits an employer from taking an adverse employment action against an employee in retaliation for her opposition to discriminatory practices prohibited under the statute.  In this case, plaintiff alleges hostile-work environment and retaliation claims against the City.  The City moves for summary judgment against plaintiff on both claims, arguing that plaintiff cannot establish a *prima facie* case for sexual harassment or retaliation.  For the reasons discussed below, the court finds that a genuine issue of fact exists as to whether the City

13

is entitled to summary judgment on the hostile-work environment claim.

**A.      Hostile-Work Environment**

The court first considers plaintiff's hostile-work environment claim under Title VII. Relevant here, to prove a claim for hostile-work environment premised on sexual harassment, a plaintiff may rely on one of two theories. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753-54 (1998). Under the first theory, the plaintiff must prove that the harassment culminated in a "tangible employment action" against her. *Id*. Under the second or "hostile work environment" theory, the plaintiff must prove that she suffered changes to the terms and conditions of her employment as a result of severe or pervasive harassment. *Id*. at 754. Here, plaintiff relies on the second theory, alleging that she suffered disparate treatment on the basis of her gender and that the treatment altered the terms and conditions of her employment with the City. (Doc. 1 at 4 ¶¶ 15-19).

The *prima facie* case for a claim of hostile-work environment requires that plaintiff prove:  (1) she belongs to a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the harassment complained of was sufficiently severe or pervasive to alter the conditions of her employment and create a discriminatorily abusive working environment; and (5) the employer is liable. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65 (1986); *Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999) (*en banc*). The law is well-settled that "the trier of fact must determine the existence of sexual harassment in light of 'the record as a whole' and 'the totality of circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred.'" *Meritor Savings Bank*, 477 U.S. at 69 (citing 29 C.F.R. § 1604.11(b) (1985)). Thus,

"[w]orkplace conduct is not measured in isolation."  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (*per curiam*).

Here, plaintiff has established the first three elements of the *prima facie* case.  First, as a female, plaintiff clearly belongs to a protected group.  She has also established the second and third elements because the record evidence is clear that plaintiff's co-workers subjected her to unwelcome sexual harassment based on her sex.  Winston's use of explicit language regarding plaintiff's female body parts when stating that she should not received preferential treatment was clearly gender-specific, derogatory, and humiliating.  Similarly, the sexually-laden conversations of workers in the day room included words and conduct that were gender-specific, derogatory, and humiliating to plaintiff and women as a group.

Perhaps recognizing the establishment of the first three elements, the City particularly challenges whether the harassment was sufficiently severe or pervasive under the fourth element of the *prima facie* case.  (Doc. 13 at 19).  The law is well-established that sexual harassment is actionable under Title VII only if it is so severe or pervasive as to alter the conditions of the employee's employment and create an abusive working environment.  *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  Importantly, this requirement contains both subjective and objective components.  *See Mendoza*, 195 F.3d at 1246.  An "employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment and this subjective perception must be objectively reasonable."  *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010) (*en banc*) (quotation marks and citations omitted).  Here, on summary judgment, the court finds sufficient evidence to create a fact issue for a jury as to whether the harassment was abusive and whether it altered the terms

15

and conditions of her employment.

First, plaintiff satisfies the subjective component with her testimony that the language used by her co-workers brought her to tears, caused her to complain daily, and ultimately caused her to resign. (Doc. 14-1, Plaintiff Dep., at 84:8; 129:14-18; 172:11; 295:2-4). Further, she testified that, due to her complaints of harassment, Cooper and/or Hilton assigned her to more strenuous work and suspended her. (Doc. 14-1, Plaintiff Dep., 70:6-7; 160:1-8; 297:21-23). In view of this testimony, plaintiff has clearly presented sufficient evidence to create a fact issue as to whether she subjectively perceived the harassment as severe or pervasive.

The court also finds that plaintiff produces sufficient evidence to create an issue of fact as to whether the harassment was objectively severe or pervasive. Whether plaintiff's belief was objectively reasonable is determined from "the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Reeves*, 594 F.3d at 809 (internal quotation marks and citations omitted). Such a determination specifically considers "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002). Importantly, the objective component is not subject to "mathematical precision," but rather, courts can "infer that an environment is 'hostile' or 'abusive' from the circumstantial facts viewed in their proper context." *Edmund v. Univ. of Miami*, 441 Fed. App'x. 721, 725 (11th Cir. 2011) (citing *Bryant v. Jones*, 575 F.3d 1281, 1297 (11th Cir. 2009)).

In cases, like the present, where both gender-specific and indiscriminate vulgarity

allegedly pervaded the workplace, the court must consider the specific language used as well as its context.  A core principle of employment discrimination law is that "sexual language and discussions that truly are indiscriminate do not themselves establish sexual harassment under Title VII."  *Reeves*, 594 F.3d at 809; *see also Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287 1301-02 (11th Cir. 2007) ("Title VII does not prohibit profanity alone, however profane.  It does not prohibit harassment alone, however severe and pervasive.").  Instead, Title VII prohibits situations in which "members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (quoting *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring)).  Particularly relevant here, "words and conduct that are sufficiently gender-specific and either severe or pervasive may state a claim of a hostile work environment, even if the words are not directed specifically at the plaintiff."  *Reeves*, 594 F.3d at 811.

Applying these legal standards to the facts of this case, the court finds that a reasonable person could conclude that the conduct in this case was sufficiently severe or pervasive to constitute a hostile-work environment based on sexual harassment.  Similar to the facts in *Reeves*, a meaningful portion of the language and conduct alleged may reasonably be construed as gender-specific, degrading to women, and humiliating.  Winston clearly targeted plaintiff's gender with degrading comments that she should not receive special treatment because of her "titties" and "pussy."  (Doc. 14-1, Plaintiff Dep., at 84:1-4; 92:4-6).  Additionally, his comments to plaintiff about women wearing tongue rings to "lick each other's clits and pussies" were targeted at plaintiff's gender.  (Doc. 14-1, Plaintiff Dep., at 174:13-16).  The conduct of plaintiff's male co-workers in the day room was also clearly gender-degrading because they

17

referred to "the ass on that girl," "big ol' titties," "her crotch," and "her underwear." (Doc. 14-1, Plaintiff Dep., at 205:21; 206:1-3: 215:22). Additionally, the alleged comments from Bassanatt and Horton about "getting blow jobs while they are at work from prostitutes" and "getting their dicks whacked off" while getting massages was gender-degrading and humiliating to women. (Doc. 14-1, Plaintiff Dep., at 208:1-2; 215:5-6). Finally, plaintiff also testified that Gardner rolled his eyes in the back of head only in front of females. (Doc. 14-1, Plaintiff Dep., at 108:16-20). In sum, a reasonable juror could find that his gender-specific, degrogatory language and conduct exposed plaintiff to "disadvantageous terms or conditions of employment." *Oncale*, 523 U.S. at 80 (quoting *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring)). Stated another way, a reasonable person could conclude that plaintiff's conditions of employment were degrading and humiliating in a way that the conditions of her male co-workers' employment were not.

In so finding, the court finds that a reasonable person could conclude that the language and conduct exceeds simple teasing, offhand comments, or isolated incidents. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (Title VII is not a "general civility code") (internal citations omitted). Instead, taking all reasonable inferences in favor of plaintiff, the language and conduct constituted intentional and repeated discrimination directed at plaintiff and women as a group. Plaintiff testified that the harassment occurred "everyday [she] worked" with Winston on the concrete crew and that gender-degrading language was used "every day in the day room, and nobody would ever say anything to them." (Doc. 14-1, Plaintiff Dep., at 172:11-14; 205:11-12). As the Supreme Court has observed, "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."

*Oncale*, 523 U.S. at 81–82.  Here, the constellation of surrounding circumstances demonstrates a genuine issue of material fact as to whether the harassment complained of was sufficiently severe or pervasive to alter the conditions of plaintiff's employment and create a discriminatorily abusive working environment.

The City appears to contend that the fact that plaintiff made only a limited number of complaints of harassment before it took remedial action renders the alleged harassment insufficient to be severe or pervasive.  (Doc. 13 at 21-22).  This contention overlooks the fact that plaintiff testified that her co-workers in the day room used harassing language "every day" she worked in the Street Maintenance Department.  Further, the City's contention improperly construes plaintiff's testimony to indicate that the harassment ceased after the April 29, 2009, meeting with the mayor.  Instead, plaintiff testified that after the meeting, Winston stopped making comments toward her, but that the City continued to assign her to the concrete crew with Winston and that, in her presence, he continued to whistle and make comments referencing "pussy" and "titties" to other women who walked near the work site.  (Doc. 14-1, Plaintiff Dep., at 277:7-9; 289:6-9; 290-293).  Plaintiff further testified that she continued to complain about Winston's conduct to Stovall and Gladden before her resignation in February 2010.  (Doc. 14-1, Plaintiff Dep., at 293:15-23).  The court agrees that plaintiff did not produce evidence indicating that the comments by Bassanatt and Horton continued after the meeting with the mayor or that pornographic magazines or items continued to be found in the truck she often drove.  However, the court still finds that plaintiff has produced sufficient evidence for a reasonable person to conclude that the language and conduct in this case created a discriminatorily abusive working environment.  Therefore, viewing the evidence in the light most favorable to plaintiff, she has

established a fact issue for a jury as to whether the conduct in this case was sufficiently severe or pervasive to be actionable under Title VII.

Lastly, plaintiff has also demonstrated a genuine issue of material fact as to the fifth element of the *prima facie* case, *i.e.*, whether the City is liable for the harassment.  The law is well-established that where the alleged sexual harassment is committed by a co-worker, as here, the employer is liable "if it knew or should have known of the harassing conduct but failed to take prompt remedial action."  *Miller*, 277 F.3d at 1278.  Here, plaintiff has produced evidence indicating that her supervisors knew of the harassing conduct by her co-workers in the day room, as well as that of Winston and Gardner.  She has further produced evidence creating a genuine issue of material fact as to whether the City took prompt remedial action.  Plaintiff submits evidence indicating that City officials met with her after the suspension and subsequently warned her co-workers about the alleged harassment.  However, whether this action was prompt and effective is in dispute.  Plaintiff testified that she complained numerous time to multiple supervisors and served her suspension before the April 29, 2009, meeting occurred.  She also testified that even after the meeting Cooper and/or Hilton continued to assign her to the concrete crew with Winston and that he continued to make gender-specific, degrading comment to and about women in her presence.  (Doc. 14-1, Plaintiff Dep., at 285-94).

In sum, plaintiff has established a *prima facie* case of hostile-environment claim under Title VII.  Therefore, the City's summary-judgment motion is due to denied as to this claim.

**B.      Retaliation**

Plaintiff also claims that the City took adverse action against her in retaliation for her complaints of sexual harassment.  (Doc. 1 at 5).  Under the opposition clause of Title VII, an

employer may not retaliate against an employee because the employee has "opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). Here, plaintiff invokes the opposition clause by claiming in the Complaint that, after she complained of the harassment, the City took three distinct adverse actions against her: (1) assigning her more strenuous work; (2) suspending her without pay for five days; and (3) constructively discharging her.[6] (Doc. 1 at 5 ¶ 22-24).

The City argues that it is entitled to a judgment as a matter of law because plaintiff can neither establish a *prima facie* case of retaliation, nor establish that its stated reason for any adverse action wad pretext for retaliation. (Doc. 13 at 23-24). "A *prima facie* case of retaliation under [§ 2000e-3(a)] requires the plaintiff to show that: (1) she engaged in an activity protected under Title VII; (2) she suffered [a materially adverse] action; and (3) there was a causal connection between the protected activity and the adverse ... action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008); *see also Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 66 (2006). Once a *prima facie* case is established, the employer must proffer a legitimate, non-retaliatory reason for the adverse-employment action. *See Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998). For the reasons discussed below, the court finds that plaintiff has established a *prima facie* case of retaliation for her claim premised on her suspension, but not her claims concerning more strenuous work assignments and constructive discharge. Further, plaintiff has created a jury question as to whether the City's stated reason for her suspension was pretext for retaliation. Accordingly, the City is entitled to summary judgment on plaintiff's

---

[6]Notably, in response to the City's summary-judgment motion, plaintiff addresses only the merits of the retaliation claim premised on her suspension. (Doc. 20 at 27-29).

retaliation claims for more strenuous work assignments and constructive discharge, but not, her

suspension claim.

       **1.**     ***Prima Facie* Case**

First, plaintiff has established a jury question as to the first element of the *prima facie*

case because she testified that she complained to various supervisors of sexual harassment on

multiple occasions, and these complaints clearly constitute statutorily protected activity. *See*

*Pipkins v. City of Temple Terrace*, 267 F.3d 1197, 1201 (11th Cir. 2001) ("Statutorily protected

expression includes internal complaints of sexual harassment to superiors.").  Additionally, she

established a jury question as to the second element, *i.e.*, whether she suffered a materially

adverse action, as to her claims premised on more strenuous assignments and her suspension.

Simply, these actions could have "dissuaded a reasonable worker from making or supporting a

charge of discrimination."  *Burlington*, 548 U.S. at 68 (internal quotation marks omitted).  She

has not, however, created a jury question as to whether she suffered a constructive discharge.

"To prove a constructive discharge, a plaintiff must demonstrate that working conditions were so

intolerable that a reasonable person in her position would have been compelled to resign."

*Griffin v. GTE Fla., Inc.*, 182 F.3d 1279, 1283 (11th Cir. 1999).  Here, plaintiff simply has not

demonstrated that her working conditions were intolerable.  Instead, she testified that her

working conditions improved after the April 29, 2009, meeting, and she did not resign until eight

months after the meeting (February 2010).  (Doc. 14-1, Plaintiff Dep., at 284:11-17; 291-93).

Further, she testified that she resigned because she "got tired of the harassment," rather than

because the working environment was intolerable.  (Doc. 14-1, Plaintiff Dep., at 295:2-4).

Lastly, as to the third element, plaintiff has demonstrated a causal connection between her

desire to engage in protected activity and her suspension.  Hilton's alleged statement that "I know what you're going to do at city hall and I'm not going to let that bullshit happen, I'm going to stop it right here," immediately followed by his suspension of plaintiff when she left the work site creates a jury question as to causal connection.  (Doc. 14-1, Plaintiff Dep., at 240:1-4).  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *Shotz v. City of Plantation*, 344 F.3d 1161, 1180 n.30 (11th Cir. 2003).  However, plaintiff has not produced evidence demonstrating a causal connection between her complaints of harassment and more strenuous work.  Instead, she only testified that she assumed her assignment to the concrete and asphalt crews resulted from her complaints.

In sum, plaintiff has established a *prima facie* case of retaliation as to her claim premised on her suspension.

### 2.      Pretext

As referenced above, once a plaintiff has established a *prima facie* case of retaliation, the burden shifts to the employer to provide a legitimate, non-discriminatory reason for its action.  *See EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002).  The City contends that it suspended plaintiff as a disciplinary action for unauthorized leave.  (Doc. 13 at 23-24).  With a nondiscriminatory reason established, the burden shifts to plaintiff, requiring a showing that the City's proffered reason is mere pretext for unlawful discrimination.  *Id.* at 1272-73.

To demonstrate pretext, plaintiff must offer more than mere "conclusory allegations or unsupported assertions."  *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996).  She must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [City's] proffered legitimate reasons for its action that a reasonable

23

factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotation marks omitted).  Important here, a close temporal proximity between the protected activity and the adverse employment action, by itself, does not prove pretext, but may serve as evidence of pretext.  *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006); *Wascura v. City of S. Miami*, 257 F.3d 1238, 1244-45 (11th Cir. 2001).  Additionally, an employer's deviation from its standard procedure may serve as evidence of pretext.  *See Hurlbert*, 439 F.3d at 1299.

To argue that the City treated her differently, plaintiff argues that Hilton's deposition testimony indicates that employees who leave the work site without permission should receive only an oral or written warning.  (Doc. 20 at 28-29).  This contention is misleading because Hilton did not testify that an employee always received only an oral or written warning for leaving the work site without permission.  Instead, he referenced the Public Works Employee Handbook, which incorporates a progressive disciplinary scale and allows for discretion in certain situations.  (Doc. 14-10, Handbook, at 8) (Doc. 21-1, Hilton Dep., at 25-26).  However, Hilton testified that he would not necessarily follow the Handbook and suspend employees for new infractions, but would do so "[w]henever they continue to act in a way that needs discipline."  (Doc. 21-1, Hilton Dep., at 25:2-26:19-21).[7]  Further, Hilton's statement that he planned to stop her "bullshit" must be considered as circumstantial evidence of his retaliatory intent at this juncture.  The court also cannot ignore the fact that the City did not always follow it's handbook and treated plaintiff differently in the present circumstances by following the

---

[7]Plaintiff also argues in her brief that Cooper testified that "employees have taken off without available leave without suspension." (Doc. 20 at 29 (citing Doc. 21-10, Cooper Dep., at 34:1-11).  However, Cooper's testimony is much more limited than this general characterization by plaintiff because, in fact, Cooper testified that employees who lacked leave were not suspended for missing work if they were sick and brought a note from a doctor.  (Doc. 21-10, Cooper Dep., at 34:1-11).

Handbook.  Accordingly, the court determines that the motion for summary judgment as to plaintiff's suspension claim is due to be denied.

<b>CONCLUSION</b>

For the foregoing reasons, the Motion for Summary Judgment by the City of Gadsden (doc. 12) is due to be denied in part and granted in part.  The motion is due to be denied as to plaintiff's claims of a hostile-work environment and for retaliation as to her suspension, and granted as to her remaining claims of retaliation in her assignments and constructive discharge.

**DONE**, this 15th day of February, 2012.

_John E. Ott_

**JOHN E. OTT**
United States Magistrate Judge